**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| MANOJ MARATHE, Individually and on behalf of all others similarly situated,<br><br>　　　Plaintiff,<br><br>　　　v.<br><br>Humana Inc., Bruce D. Broussard, And Susan M. Diamond,<br><br>　　　Defendants. | **Case No:**<br><br><u>**CLASS ACTION**</u><br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT**

Plaintiff Manoj Marathe ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, among other things, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, and announcements made by Defendants, public filings, wire and press releases published by and regarding Humana Inc. ("Humana" or the "Company"), and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

I.　　**NATURE OF THE ACTION**

1.　　This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded Humana common stock, including purchasers of call options and/or sellers of put options between July 27, 2022 and January 24, 2024, inclusive (the "Class Period"),

1

seeking to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act ("SEC") of 1934 (the "Exchange Act"), and SEC Rules 10b-5 promulgated thereunder.

## II.   JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

4.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district. Humana is also incorporated in this District.

5.      In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## III.   PARTIES

6.      Plaintiff Manoj Marathe as set forth in the accompanying certification, incorporated by reference herein, purchased Humana common stock and sold puts during the Class Period and was economically damaged thereby.

7.      Defendant Humana is a Delaware corporation with principal executive offices at 500 West Main Street, Louisville, Kentucky 40202. It is a health insurance company that provides medical benefit plans to approximately 17 million members. As is relevant here, Humana offers

individual Medicare plans (approximately 70% of the Company's retail revenues), group Medicare plans (approximately 8% of the Company's retail revenues), commercially fully-insured plans, and specialty medical benefit plans.

8.    Humana's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "HUM."

9.    Defendant Bruce D. Broussard is the Company's Chief Executive Officer ("CEO") and a Company Director.

10.    Defendant Susan M. Diamond is the Company's Chief Financial Officer ("CFO").

11.    Defendants Broussard and Diamond are collectively referred to herein as the "Individual Defendants."

12.    Each of the Individual Defendants:

(a)    directly participated in the management of the Company;

(b)    was directly involved in the day-to-day operations of the Company at the highest levels;

(c)    was privy to confidential proprietary information concerning the Company and its business and operations;

(d)    was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)    was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)    was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

3

(g)    approved or ratified these statements in violation of the federal securities laws.

13.    The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

14.    The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

15.    Humana and the Individual Defendants are collectively referred to herein as "Defendants."

## IV.    SUBSTANTIVE ALLEGATIONS

### A.  Defendants' False and Misleading Statements

16.    The Class Period begins on July 27, 2022, to coincide with the Company's announcement of its second quarter 2022 financial results. Among other things, Humana reported adjusted earnings per share ("EPS") of $8.67 for the quarter, an "outperformance" of approximately $1.00 per share higher than the Company's previous projections, which was "driven primarily by . . . better-than-anticipated medical cost trends in the company's individual Medicare Advantage and Medicaid businesses, partially offset by higher than expected non-inpatient utilization in group Medicare Advantage." Humana also indicated that low utilization rates would continue into the future and raised its full year 2022 adjusted EPS guidance by $0.25 per share to "approximately $24.75" due to "lower utilization trends and lack of COVID-19 headwind seen to date."

17.    In response to a question from a Goldman Sachs analyst about the reasons for the favorable utilization rates during the Company's earnings call with investors that same day,

4

Defendant Diamond, the Company's CFO, attributed lower inpatient utilization rates to reduced spread of the flu, "continued inpatient-to-outpatient shifts," and "improved impact from some of [the Company's] utilization management programs." Defendant Diamond also expressed confidence that these factors would continue to favorably impact utilization rates, explaining, "we don't have any reason to think that inpatient to outpatient or the positive utilization management impacts won't continue for the rest of the year, and so that is contemplated in our full year guide." Acknowledging a higher utilization rate in the Company's group Medicare Advantage segment, which accounted for only 8.4% of Humana's 2021 revenues, that "has turned out to be more reflective of just deferred utilization and pent-up demand," Defendant Diamond explained that this "pent-up demand . . . may still moderate in the back half of the year," and assured investors that "we'll certainly continue to monitor it."

18.    Throughout the Class Period, Defendants continued to downplay the risk that pent-up demand for healthcare services would cause a utilization surge that would pressure the Company's profitability. For example, when the Company held its Investor Day on September 15, 2022, Defendant Diamond assured investors that medical costs for Humana's individual Medicare Advantage business were "running favorable to our expectations," driven by "lower-than-expected in-patient utilization." Defendant Diamond further touted that that "those trends have continued in the recent weeks" with "in-patient unit costs and non-in-patient trends coming in lower than [the Company] initially estimated." Defendant Diamond also explained that while higher utilization in the first quarter of 2022 had been "potentially due to pent-up demand," the Company was "seeing positive current year restatements and moderating trends" in its group Medicare Advantage segment, including moderating surgical trends over the second quarter.

Confident in its ability to sustain these utilization trends, Humana also raised its full year adjusted EPS guidance by $0.25 per share to $25.00 per share.

19. When the Company released its third quarter 2022 financial results on November 2, 2022, Humana reported that the benefits expense ratio for its retail segment—which includes its insurance business—decreased 160 basis points from 88.1% for the 2021 quarter, to 86.5% for the 2022 quarter (and decreased 40 basis points from 87.6% for the 2021 period, to 87.2% for the 2022 period), "primarily due to the favorable impact of higher per member individual Medicare Advantage premiums and lower inpatient utilization associated with the individual Medicare Advantage business." During the Company's earnings call with investors the same day, Defendant Diamond reiterated that group Medicare Advantage utilization was also moderating during the third quarter "suggesting that some of the higher trend we described previously was likely due to pent-up demand," also suggesting that utilization would further moderate as the Centers for Medicare & Medicaid Services ("CMS") removed certain items from its inpatient-only list and "inpatient to outpatient movement" continued, ultimately explaining that the Company was "counting on sort of normal course baseline utilization trends."

20. Defendants continued to represent that the Company did not expect any increased costs resulting from pent-up demand for healthcare procedures in the first half of 2023. For example, when speaking at a J.P. Morgan healthcare conference on January 9, 2023, Defendant Diamond answered an analyst's question about "pent-up demand" for healthcare procedures and the impact on "inpatient/outpatient utilization levels compared to [the Company's] initial expectations," explaining that, after a spike in COVID rates, "we would see some, what we call, above baseline utilization[,] [b]ut then it would typically in a . . . reasonable period of time come back down." Defendant Diamond further explained that because "[w]e haven't had any of those

6

major surges of COVID in a while. . . . our view would be that there really isn't pent-up demand that we have to be concerned about." Additionally, in response to a question about potential increases in surgeries in 2023 due to higher acuity levels, Defendant Diamond again indicated that "[w]e haven't seen anything that we would call an outlier or have a significant concern."

21.    During Humana's fourth quarter 2022 earnings call on February 1, 2023, Defendants again directly refuted the possibility of pent-up demand pressuring the Company's profits. Specifically, Defendant Diamond highlighted the performance of the Company's Medicaid business during the quarter, noting "lower-than-anticipated medical costs" and touting that the "favorable utilization seen throughout the year in [the Company's] commercial group medical and specialty businesses persisted in the fourth quarter." Defendant Diamond further dismissed concerns of a pending utilization increase due to pent-up demand, explaining that "based on all the analysis we've done, we don't believe there's a large amount of pent-up demand sort of that needs to work its way through the system" and that the Company's guidance "does not have an explicit assumption around pent-up demand, but rather just taking the resulting sort of baseline trend we experienced in 2022." The Company also issued insurance segment's benefits expense ratio guidance of between 86.3% and 87.3% for the full year 2023.

22.    In connection with its 2022 annual report on February 16, 2023, Humana attributed a 40 basis point decrease in its consolidated benefits expense ratio from 86.7% in 2021, to 86.3% in 2022, primarily to "higher per member individual Medicare Advantage premiums and lower inpatient utilization associated with the individual Medicare Advantage business."

23.    When the Company released its first quarter 2023 financial results on April 26, 2023, the Company raised its full year 2023 adjusted EPS guidance by $0.25 per share to "at least $28.25 [per share]," with Defendant Broussard, the Company's Chief Executive Officer, touting

the Company's "strong start to the year," driven by "strong membership growth and favorable inpatient utilization trends in our individual Medicare Advantage business." During the Company's earnings call with investors that same day, Defendant Diamond noted that "[w]hile non-inpatient claims are less complete, early indicators suggest trends are in line with expectations."

24. Less than two weeks later, speaking at a Bank of America healthcare conference on May 9, 2023, Defendant Diamond again downplayed pent-up demand and the resulting pressures on the Company's profitability. Responding to a question from a Bank of America analyst regarding strong volume numbers being reported by medical providers, Defendant Diamond explained that the Company "did contemplate that we would see normalized trend development in 2023, off of our 2022 baseline" and that the Company "did plan for a normalized trend, and you can think of that as just sort of typical trend that you would apply for utilization and unit cost on top of your starting point." Defendant Diamond further assured investors that "we'll certainly continue to watch the trends develop over the rest of the year," but that "so far, what we're seeing is . . . slightly favorable [utilization] expectations on the inpatient side" that are "consistent, if not slightly positive for the first quarter."

25. The following month, on June 1, 2023, Humana reaffirmed its full year 2023 adjusted EPS guidance of at least $28.25 per share.

26. The above statements identified in ¶¶ 24-33 were materially false and misleading, and failed to disclose material adverse facts about the Company's business and operations. Specifically, Defendants downplayed pressures on the Company's adjusted EPS resulting from increased medical costs associated with pent-up demand for healthcare procedures (especially as

COVID concerns abated) which, contrary to the Company's assurances, resulted in increased utilization rates and costs.

## B. THE TRUTH BEGINS TO EMERGE

27. Just over one month after Defendant Diamond assured investors that the Company was observing favorable utilization trends, and less than two weeks after the Company reaffirmed its adjusted EPS guidance, investors began to learn the truth about the profitability pressures facing the Company due to pent-up demand for medical services. Specifically, on June 13, 2023, UnitedHealth Group Inc. ("UnitedHealth"), one of Humana's principal health insurer competitors, revealed that it was seeing "higher levels" of outpatient care activity and suggested that this higher utilization was due to "pent-up demand or delayed demand being satisfied." UnitedHealth further revealed that it was "seeing very strong volumes" in certain areas, including ambulatory surgery, and an overall "higher number of cases that are being performed."

28. Given the similarities in Humana's and UnitedHealth's businesses, and the likelihood that Humana would also suffer increased utilization and costs due to pent-up demand, the price of Humana common stock declined $57.63 per share, or more than 11%, from a close of $512.63 per share on June 13, 2023, to close at $455.00 per share on June 14, 2023.

29. Just three days later, on June 16, 2023, Humana confirmed investors' fears when it reported "higher than anticipated non-inpatient utilization trends, predominately in the categories of emergency room, outpatient surgeries, and dental services, as well as inpatient trends that have been stronger than anticipated in recent weeks, diverging from historical seasonality patterns." Although the Company re-affirmed its full year insurance segment benefits expense ratio guidance of between 86.3% and 87.3%, given the increased utilization rates, Humana informed investors that it "now expects to be at the top end of this full year range"—revealing a

less profitable claims environment. Critically, the Company also revealed that it "assume[d] it will continue to experience moderately higher-than-expected trends for the remainder of the year." The Company further revealed that Humana had already considered the increased utilization rates in connection with bids it submitted to CMS in connection with the 2024 Medicare Advantage program eleven days prior, on June 5, 2023.

30.    On this news, the price of Humana common stock declined $18.20 per share, or almost 4%, from a close of $463.85 per share June 15, 2023, to close at $445.65 per share on June 16, 2023.

31.    Following these initial admissions regarding escalating utilization rates, the Company continued to announce additional increases in its expected medical costs over the following months. While Defendants indicated in August 2023 that the utilization rate increases first disclosed in June had stabilized at the new higher levels, on November 1, 2023, Defendant Diamond announced, in connection with Humana's third quarter 2023 investor conference call, that the Company was "planning for the higher level of utilization seen in the third quarter to continue for the remainder of the year." Defendant Diamond stated that Humana was "increasing [its] full year insurance segment benefit ratio guidance to approximately 87.5%, which implies a fourth quarter ratio of 89.5%"—an increase from the range of between 86.3% and 87.3% projected earlier in the year. Despite the increased benefits expense ratio, Humana reaffirmed its 2023 adjusted EPS guidance of "at least" $28.25 per share.

32.    Then, on January 18, 2024, Humana preliminarily released its financial results for the fourth quarter and full year 2023, and shocked investors by revealing that its benefits expense ratio had increased to approximately 91.4% for the fourth quarter of 2023 and approximately 88% for the full year 2023. Given the Company's inability "to offset the entirety of the higher than

anticipated medical costs that continued to increase through the end of the fourth quarter," the Company's 2023 adjusted EPS were only $26.09 per share, or more than $2 per share less than what the Company had predicted in November 2023.

33.     In response to this announcement, the price of Humana common stock fell $35.78 per share, or approximately 8%, from a close of $447.76 per share on January 17, 2024, to close at $411.98 per share on January 18, 2024.

34.     On January 25, 2024, the Company further shocked the market when it announced a loss of $4.42 per share (adjusted loss per share of $0.11) for the fourth quarter of 2023 that was "driven by higher than anticipated inpatient utilization . . . and a further increase in non-inpatient trends," and stated that it expected the higher level of medical costs would "persist throughout 2024." As a result, Humana revealed that it expected 2024 adjusted EPS of only $16 per share (a $10 per share decrease from 2023 and well below analysts' expectations of $29 per share).

35.     In response to a question during the accompanying investor conference call about the Company's ability to predict medical costs by using data from preauthorizations for procedures, Defendant Diamond indicated that the increases in medical costs for the fourth quarter of 2023 were "probably more disproportionately inpatient-driven" and admitted that "[w]e get authorization data for over -- like 99% of the inpatient events that occur" and that "it's very accurate in predicting, and we do receive it in more real time." Defendant Diamond failed, however, to answer why—if the Company had clear insight into inpatient procedure medical trends—the elevated level of medical costs had not been communicated to investors in a timelier fashion.

11

36.     In response to these revelations, the price of Humana common stock declined an additional $47.04 per share, or nearly 12%, from a close of $402.40 per share on January 24, 2024, to close at $355.36 per share on January 25, 2024.

## V.     PLAINTIFF'S CLASS ACTION ALLEGATIONS

37.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired Humana common stock, including purchasers of call options and/or sellers of put options publicly traded on the NYSE during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

38.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

39.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

40.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

41.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of the Company;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Defendants caused the Company to issue false and misleading filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false filings;

- whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

42.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

43.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- the Company's securities met the requirements for listing, and were listed and actively traded on the NYSE, an efficient market;

- as a public issuer, the Company filed public reports;

- the Company communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

- the Company's securities were liquid and traded with moderate to heavy volume during the Class Period; and

- the Company was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

44.    Based on the foregoing, the market for the Company securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of the common units, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

45.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

14

## VI.   NO SAFE HARBOR

46.    Defendants' "Safe Harbor" warnings accompanying any forward-looking statements issued during the Class Period were ineffective to shield those statements from liability. Defendants are liable for any false and/or misleading forward-looking statements pleaded because, at the time each forward-looking statement was made, the speaker knew the forward-looking statement was false or misleading and the forward-looking statement was authorized and/or approved by an executive officer of the Company who knew that the forward-looking statement was false. None of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## VII.   LOSS CAUSATION/ECONOMIC LOSS

47.    Defendants' wrongful conduct directly and proximately caused the economic loss suffered by Plaintiff and the Class. The price of Humana common stock significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses. As a result of their purchases of Humana securities during the Class Period, Plaintiff and the Class suffered economic loss, i.e., damages, under the federal securities laws.

## VIII.    ADDITIONAL SCIENTER ALLEGATIONS

48.    During the Class Period, Defendants had both the motive and opportunity to commit fraud. They also had actual knowledge of the misleading nature of the statements they made, or acted in reckless disregard of the true information known to them at the time. In so doing, Defendants participated in a scheme to defraud and committed acts, practices, and participated in a course of business that operated as fraud or deceit on purchasers of Humana common stock, including purchasers of call options and/or sellers of put options during the Class Period.

## IX.    CLAIMS AGAINST DEFENDANTS

### COUNT I
### For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder
### Against All Defendants

49.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

50.    This Count asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

51.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Plaintiff and the Class; and (2) cause Plaintiff and the Class to purchase Humana securities at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

52.    Defendants: (1) employed devices, schemes, and artifices to defraud; (2) made untrue statements of material fact and/or omitted material facts necessary to make the statements not misleading; and (3) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of Humana common stock, including purchasers of call

16

options and/or sellers of put options in an effort to maintain artificially high market prices thereof in violation of Section 10(b) of the Exchange Act and SEC Rule 10b- 5.

53.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the Class suffered damages in connection with their respective purchases of the Company's common stock, including purchases of call options and/or sales of put options during the Class Period.

<strong><u>COUNT II</u><br>Violations of Section 20(a) of the Exchange Act<br><u>Against the Individual Defendants</u></strong>

54.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

55.    The Individual Defendants acted as controlling persons of Humana within the meaning of Section 20(a) of the Exchange Act. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations, and/or intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control—and did influence and control, directly or indirectly—the decision-making of the Company, including the content and dissemination of the various false and/or misleading statements. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

56.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the activities giving rise to the securities violations as alleged herein, and exercised the same.

17

57.    As described above, the Company and the Individual Defendants each violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable under Section 20(a) of the Exchange Act. As a direct and proximate result of this wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of Humana common stock, including purchases of call options and/or sales of put options during the Class Period.

58.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## X.    PRAYER FOR RELIEF

**WHEREFORE**, plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    awarding damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

(c)    awarding plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    awarding plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## XI.    JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: July 31, 2024

Of Counsel:

Phillip Kim, Esq.
Laurence M. Rosen, Esq.
THE ROSEN LAW FIRM, P.A.
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
Email: lrosen@rosenlegal.com

Respectfully submitted,

FARNAN LLP

By:  /s/ Michael J. Farnan
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 N. Market Street, 12th Floor
Wilmington, DE 19801
Telephone: (302) 777-0300
Facsimile: (302) 777-0301
Email: bfarnan@farnanlaw.com
Email: mfarnan@farnanlaw.com

*Attorneys for Plaintiff*